**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **STEPHANIE WILBUR,** | ) | |
| 1870 North Lennox St., Apt. 14A | ) | |
| Olathe, Kansas 66061, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: |
| | ) | |
| **MISSION CHATEAU, L.L.C.,** | ) | **JURY TRIAL DEMANDED** |
| (Serve Resident Agent: | ) | |
| Michael F. Flanagan | ) | |
| 14005 Outlook | ) | |
| Overland Park, Kansas 66223), | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **TUTERA SENIOR LIVING &** | ) | |
| **HEALTH CARE, L.L.C.,** | ) | |
| (Serve Resident Agent: | ) | |
| Michael F. Flanagan | ) | |
| 14005 Outlook | ) | |
| Overland Park, Kansas 66223), | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **TUTERA HEALTH CARE SERVICES,** | ) | |
| **L.L.C.,** | ) | |
| (Serve Resident Agent: | ) | |
| Michael F. Flanagan | ) | |
| 14005 Outlook | ) | |
| Overland Park, Kansas 66223), | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **TUTERA GROUP, INC.,** | ) | |
| (Serve Resident Agent: | ) | |
| Michael F. Flanagan | ) | |
| 14005 Outlook | ) | |
| Overland Park, Kansas 66223), | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Stephanie Wilbur states the following as her causes of action against Defendants Mission Chateau, L.L.C., Tutera Senior Living & Health Care, L.L.C., Tutera Health Care Services, L.L.C., and Tutera Group, Inc.

1.      Plaintiff Stephanie Wilbur is an African American, female resident of Olathe, Johnson County, Kansas.

2.      Defendant Mission Chateau, L.L.C. is a Kansas limited liability company that conducts business in Johnson County, Kansas.

3.      Defendant Mission Chateau, L.L.C. is an employer as defined and within the meaning of 42 U.S.C. § 2000e(b) of Title VII of the Civil Rights Act of 1964 as amended in 1991.

4.      Defendant Tutera Senior Living & Health Care, L.L.C. is a Kansas limited liability company that conducts business in Johnson County, Kansas.

5.      Defendant Tutera Senior Living & Health Care, L.L.C. is an employer as defined and within the meaning of 42 U.S.C. § 2000e(b) of Title VII of the Civil Rights Act of 1964 as amended in 1991.

6.      Defendant Tutera Health Care Services, L.L.C. is a foreign limited liability company that conducts business in Johnson County, Kansas.

7.      Defendant Tutera Health Care Services, L.L.C. is an employer as defined and within the meaning of 42 U.S.C. § 2000e(b) of Title VII of the Civil Rights Act of 1964 as amended in 1991.

8.      Defendant Tutera Group, Inc. is a foreign corporation that conducts business in Johnson County, Kansas.

2

9.     Defendant Tutera Group, Inc. is an employer as defined and within the meaning of 42 U.S.C. § 2000e(b) of Title VII of the Civil Rights Act of 1964 as amended in 1991.

10.    Plaintiff is bringing these claims pursuant to Title VII of the Civil Rights Act of 1964, as amended in 1991, 42 U.S.C. § 2000 et seq., and 42 U.S.C. § 1981.

11.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

12.    Venue is proper because a substantial part of the events or omissions giving rise to the claim occurred in Johnson County, Kansas in the District of Kansas within the meaning of 28 U.S.C. § 1391(b).

13.    Plaintiff filed timely Charges of Discrimination with the Equal Employment Opportunity Commission (EEOC) alleging that Defendants engaged in the discriminatory and/or retaliatory actions that are being raised in this lawsuit, or alternatively, the allegations of Plaintiff's lawsuit would have arisen from the investigation of Plaintiff's Charges of Discrimination.

14.    Notices of Right to Sue have been issued by the EEOC, and this action is being brought within ninety (90) days from the issuance of such Notices of Right to Sue.

15.    Plaintiff has fulfilled all conditions precedent to the bringing of this claim and has duly exhausted all administrative procedures in accordance with the law prior to instituting this lawsuit.

## ALLEGATIONS COMMON TO ALL COUNTS

16.    In September 2018, Plaintiff began working for Defendants as a Certified Nursing Aide (CNA) at Mission Chateau, a senior living community in Prairie Village, Kansas with apartment homes for independent living, memory care, and assisted care.

3

17.     Plaintiff became a registered CNA in June 2012 and had approximately seven years of experience as a CNA prior to working at Mission Chateau.

18.     Mission Chateau is part of what is known as the "Tutera Family Communities."

19.     Mission Chateau is listed as one of the senior living community locations on the website www.tutera.com.

20.     Defendant Mission Chateau, L.L.C. is owned and/or operated by Defendants Tutera Senior Living & Health Care, L.L.C., Tutera Health Care Services, L.L.C., and/or Tutera Group, Inc.

21.     At the time of Plaintiff's employment, Defendants Mission Chateau, L.L.C. and Tutera Senior Living & Health Care, L.L.C., Tutera Health Care Services, L.L.C., and/or Tutera Group, Inc.'s operations were interrelated, there was common management, there was centralized control of labor relations, and/or common ownership or financial control, including, but not limited to the following:

        a.      Defendants Mission Chateau, L.L.C., Tutera Senior Living & Health Care, L.L.C., Tutera Health Care Services, L.L.C., and/or Tutera Group, Inc. all share the same registered agent and organizer, Michael F. Flanagan.

        b.      Defendants Mission Chateau, L.L.C., Tutera Senior Living & Health Care, L.L.C., Tutera Health Care Services, L.L.C., and/or Tutera Group, Inc. all share the same registered office, 14005 Outlook, Overland Park, Kansas 66223.

        c.      Defendants Tutera Senior Living & Health Care, L.L.C., Tutera Health Care Services, L.L.C., and/or Tutera Group, Inc. share the same mailing address registered with the Kansas Secretary of State, 7611 State Line Road, Suite 301, Kansas City, Missouri 64114.

4

       d.      According to https://missionchateaubytutera.com, "Mission Chateau is a rental-based community showcasing extraordinary hospitality and services for independent living, assisted living, and memory care. Residents also have priority access to Tutera Senior Living & Health Care's full complement of post-acute health care services, including Home Health and Rehabilitation and Extended Stay."

       e.      Defendants Tutera Senior Living & Health Care, L.L.C., Tutera Health Care Services, L.L.C., and/or Tutera Group, Inc. provided workplace policies and/or forms to Mission Chateau and/or Defendant Mission Chateau, L.L.C.

       f.      Defendants Tutera Senior Living & Health Care, L.L.C., Tutera Health Care Services, L.L.C., and/or Tutera Group, Inc. provided human resource services to Mission Chateau and/or Defendant Mission Chateau, L.L.C.

       g.      Defendants Tutera Senior Living & Health Care, L.L.C., Tutera Health Care Services, L.L.C., and/or Tutera Group, Inc. responded to complaints of workplace discrimination made by employees working at Mission Chateau and/or Defendant Mission Chateau, L.L.C.

       h.      Defendants Tutera Senior Living & Health Care, L.L.C., Tutera Health Care Services, L.L.C., and/or Tutera Group, Inc. provided training to employees working at Mission Chateau and/or Defendant Mission Chateau, L.L.C.

       i.      Defendants Mission Chateau, L.L.C. and Tutera Senior Living & Health Care, L.L.C., Tutera Health Care Services, L.L.C., and/or Tutera Group, Inc. shared common management.

j.      Defendants Mission Chateau, L.L.C. and Tutera Senior Living & Health Care, L.L.C., Tutera Health Care Services, L.L.C., and/or Tutera Group, Inc. provided benefits to employees working at Mission Chateau and/or Defendant Mission Chateau, L.L.C.

k.      Defendants Mission Chateau, L.L.C. and Tutera Senior Living & Health Care, L.L.C., Tutera Health Care Services, L.L.C., and/or Tutera Group, Inc. transferred residents from one facility to another.

22.     When Plaintiff began working at Mission Chateau, the Director of Nursing was Pamela Eickhoff (Eickhoff), a Caucasian female, and the Assistant Director of Nursing was Annie Debo (Debo), a Caucasian female.

23.     On or around September 19, 2019, Plaintiff met with Eickhoff and Debo to discuss her performance evaluation.

24.     In her performance evaluation, Plaintiff received five "exceeds expectations" ratings and one "meets expectations" rating.

25.     Under the category "Employee Strengths and Weaknesses," Eickhoff wrote, "Stephanie is such a pleasure to work with. Takes great care of residents, willing to float AL-MC. Appearance always professional. Team Player."

26.     Under the category "Performance Expectations and Goals," Eickhoff wrote, "Becoming a mentor for new staff."

27.     During Plaintiff's performance evaluation meeting, Eickhoff told Plaintiff that she was promoting Plaintiff to a Mentor/Lead CNA position because of her positive performance review and dedication to her work.

6

28.     Eickhoff also told Plaintiff that she thought Plaintiff would be a great fit for the position.

29.     In response, Plaintiff told Eickhoff she was honored.

30.     Debo commented that she agreed that Plaintiff would also be a great fit for this position as well.

31.     In or around November 2019, Eickhoff resigned, and Tanya Leaming (Leaming), a Caucasian female, became the new Director of Nursing.

32.     It is Plaintiff's understanding that Eickhoff completed all the requisite paperwork for Plaintiff to be promoted to the Mentor/Lead position prior to her resignation.

33.     Shortly after Leaming became the Director of Nursing, Debo, the Assistant Director of Nursing, resigned.

34.     Prior to Debo resigning, Debo told Plaintiff that it was still her desire that Plaintiff move into the Mentor/Lead position.

35.     Since Leaming took over as the Director of Nursing, Plaintiff believes that she has been subjected to different terms and conditions of employment and disparate treatment based on her race/color and subjected to a hostile and offensive work environment based on her race/color, which Plaintiff found and a reasonable person would find to be offensive.

36.     Under Leaming's leadership, Caucasian employees like Lauren Drake, Kayla Williamson (Williamson), Holly Dill, Khiley Shirey, Brianha Andrews, Makenze Nimmo, and Rebecca Londo were allowed to stand around the nursing station talking and/or allowed to work at the nursing station, but black and/or African American employees were told that they could not do the same and were instructed to leave the nursing station area.

37.     Further, Leaming informed Plaintiff that corporate had taken away the ability for employees to work 12 hour shifts, but after making this announcement, Leaming continued to allow Williamson to work 12 hour shifts.

38.     It is Plaintiff's understanding that Williamson was also allowed to work every other Saturday, rather than working every other Saturday and Sunday, as other CNA's were required to work.

39.     Additionally, Leaming allowed Caucasian employees like Keith Jones to be designated as p.r.n. (as needed), but these Caucasian employees were given full-time work hours and were not required to work weekends.

40.     It is Plaintiff's understanding that management/supervising employees were aware that several of the employees (Kayla Williamson, Lauren Drake, and London Caldwell, all of whom are Caucasian) had been drinking on the job in or around late December/January 2020, but to Plaintiff's knowledge, no disciplinary action was taken against any of these employees.

41.     Additionally, it is also Plaintiff's understanding that Lauren Drake made stereotypical comments at work in October 2019 about how black people act, but no disciplinary action was taken against her.

42.     Black and/or African American employees were often required to work rotating positions on days where the facility was short staffed in assisted living, but when the facility was short staffed in the memory care unit, they were not always subjected to the same treatment.

43.     Further, leadership and promotion opportunities at Mission Chateau were given to Caucasian employees, regardless of seniority or experience.

44.     While applications for these opportunities were accepted from employees of color, employees of color were not given the positions.

45.     For example, Plaintiff applied for a receptionist position that opened in the summer of 2019.

46.     Defendants did not acknowledge her application, Plaintiff was never approached for an interview, and the position was filled by a Caucasian.

47.     Additionally, on or about January 22, 2020, Plaintiff learned that Williamson had been promoted to the Mentor/Lead CNA position, instead of her or another qualified black and/or African American employee like Monica Porter (Porter) and/or Randa Echeverria.

48.     At the time of her promotion, Williamson had just received her CNA certification in June 2019 and had only been working for Defendants at Mission Chateau since September 2019. Williamson's promotion to a Mentor/Lead CNA position was also surprising since it is Plaintiff's understanding that an employee must have worked at least one year for Defendants to be considered for a Mentor/Lead CNA position.

49.     On or about January 23, 2020, Plaintiff went to speak with Miles Nease (Nease), the Executive Director for Assisted Living and Memory Care at Mission Chateau.

50.     Plaintiff told Nease that she was upset and inquired whether she could ask him some questions.

51.     Nease agreed so Plaintiff asked him to identify the qualifications for the Mentor/Lead CNA position and how Williamson got the Mentor/Lead position over her.

52.     In response, Nease told Plaintiff the decision as to whom to promote to the Mentor/Lead CNA position was based on experience and years of service.

9

53.     Nease's response did not make sense to Plaintiff since she had more experience and years of service than Williamson.

54.     More specifically, Plaintiff had approximately seven years of CNA experience and had worked at Mission Chateau since September 2018.

55.     Further, Plaintiff frequently worked overtime, holiday shifts, and picked up extra days of work whenever there was a staff shortage.

56.     Plaintiff reminded Nease that she had worked extra hours/shifts during staff shortages and that she often was the only CNA taking care of fifteen plus memory care residents.

57.     Plaintiff told Nease that she did her job well and didn't complain.

58.     Plaintiff also explained that she was told at her last review that she would be moved into this Mentor/Lead CNA position.

59.     Plaintiff told Nease that her feelings were hurt and that she didn't understand why the decision had been made to promote Williamson over her.

60.     Nease told Plaintiff that if she was still interested in the position that he wouldn't be able to give it to her now since Plaintiff had approached him to express that she was upset.

61.     Nease then asked Plaintiff how she found out that Williamson had been selected.

62.     Plaintiff told Nease from the schedule that had just been posted.

63.     Nease asked Plaintiff who posted the schedule.

64.     Plaintiff told him that Allison Hislop (Hislop), the Assistant Director of Nursing, posted the schedule.

65.     Nease went out to look at the schedule, and Plaintiff left to go take care of a resident.

10

66.     By the time Plaintiff finished assisting the resident, she noticed that a revised scheduled (one that was not there before Plaintiff met with Nease) had been placed on the schedule board.

67.     On the revised schedule, the title of Mentor next to Williamson's name had been removed, and Williamson's status was changed from full-time to p.r.n.

68.     No explanation was given for these changes to the schedule.

69.     Despite the title of Mentor next to Williamson's name being removed from the revised schedule, Williamson performed the Mentor/Lead CNA role.

70.     On or about January 23, 2020, Porter and Plaintiff told Nease that they wanted to file grievances.

71.     Nease told Plaintiff and Porter that they would need to talk to Leaming.

72.     Later that same day, Plaintiff and Porter met with Leaming for approximately an hour.

73.     During this meeting, Plaintiff and Porter told Leaming that she believed that the decision to promote Williamson over her was unfair/discriminatory.

74.     In response, Leaming stated that the Mentor/Lead CNA position was given to Williamson because Williamson "looked better" and had a "better attitude," and Leaming told Plaintiff that she needed to move on.

75.     Plaintiff again felt discriminated against and felt that her reports of discrimination were not being addressed, let alone investigated.

76.     Plaintiff and Porter also told Leaming that they felt the black employees were treated differently and that the performance of black employees was criticized more than the performance of the Caucasian employees.

77.     At the conclusion of the meeting, Leaming wanted Plaintiff and Porter to sign a document stating that they were hurt and disappointed.

78.     Plaintiff and Porter both expressed concerns about signing this document because it did not reflect what they had discussed with Leaming.

79.     Leaming assured them that she would include the additional information they had shared with her so Plaintiff and Porter went ahead and signed the document she presented to them.

80.     On or about January 23, 2020, Plaintiff contacted corporate, i.e. Defendants Tutera Senior Living & Health Care, L.L.C.,  Tutera Health Care Services, L.L.C., and/or Tutera Group, Inc., because she did not feel like anything was being accomplished and/or resolved after her discussion with Leaming.

81.     Plaintiff did not receive a response from anyone with the corporate office so on or about January 27, 2020, Plaintiff emailed a written grievance to Joe Pollina (Pollina), the Director of Human Resources Operations for Tutera, and to Tana Richie (Richie) in Mission Chateau's local Human Resources Department.

82.     It is Plaintiff's understanding that other African American and/or black employees, other than Wilbur and herself, have also complained of race discrimination and had their complaints ignored.

83.     In her grievance, Plaintiff alleged that she had been discriminated against based on her race/color, African American, and she included the information she had discussed in the meeting Porter and she had with Leaming.

84.     It is Plaintiff's understanding that Richie shared her grievance with Nease who contacted corporate, i.e. Defendants Tutera Senior Living & Health Care, L.L.C., Tutera Health Care Services, L.L.C., and/or Tutera Group, Inc.

85.     After Plaintiff reported her good faith belief that she was being discriminated against and subjected to disparate treatment and/or harassment based on her race/color, Defendants retaliated against Plaintiff.

86.     On or about February 5, 2020, Plaintiff met with Marilyn Dove (Dove), the Human Resources Director for Defendants.

87.     During the meeting, Dove told Plaintiff that neither Eickhoff nor Debo had told Plaintiff that she would be promoted to the Mentor/Lead CNA position, but rather the comments on Plaintiff's evaluation indicated that moving her into a Mentor/Lead CNA position was merely a goal.

88.     Plaintiff did not agree with Dove's characterization that moving her into a Mentor/Lead CNA position was merely a goal.

89.     Dove also told Plaintiff that Eickhoff and Debo had written statements stating that they wanted Williamson promoted to the Mentor/Lead CNA position.

90.     Additionally, Dove told Plaintiff during the meeting that Leaming took attendance into consideration in making the decision as to whom to promote.

91.     Plaintiff told Dove that she had never been counseled or disciplined for any attendance issues.

92.     Dove expressed surprise that Plaintiff had not and told her that she should have been written up for attendance for being tardy to work.

93.     Dove also told Plaintiff that her schedule was being changed and that Plaintiff would now be required to work every other weekend because it was allegedly not fair to others that she worked Monday-Friday because of her children.

94.     On or about February 6, 2020, the day after her meeting with Dove, Plaintiff received an "Employee Corrective Action Form" for being tardy and failing to clock in before the start of her shift on three occasions.

95.     This was the first discipline and/or write-up for any performance and/or attendance issue that Plaintiff had ever received.

96.     On or about February 10, 2020, Plaintiff met with Nease and Leaming.

97.     During the meeting, Nease told Plaintiff that he understood that she had voluntarily resigned during her counseling session, and he told Plaintiff that he needed her resignation in writing.

98.     Plaintiff told Nease that she was not voluntarily resigning.

99.     Leaming insisted that Plaintiff had told her she was resigning.

100.    Plaintiff explained that she had commented that she might as well resign in response to being told that she had to work weekends.

101.    Leaming told Plaintiff that they needed to be able to work together and that beginning on February 23, 2020 that Plaintiff would need to start working every other weekend,

14

despite Leaming knowing that Plaintiff had primary custody of her children and that finding childcare for them on the weekends was going to be a hardship for Plaintiff.

102.    During the meeting, Leaming acknowledged that Plaintiff did a good job taking care of the residents in the memory care unit.

103.    Plaintiff explained that she was hurt and upset over not being selected as a Mentor/Lead and that she needed time to think about what happened and how she was going to deal with it.

104.    Leaming began coming to the memory care unit to check to make sure Plaintiff was doing her job and/or to scrutinize Plaintiff's work.

105.    Additionally, it is Plaintiff's understanding that Leaming told Sherita Pearson (Pearson), another African American employee, that Plaintiff had written a statement against her and that Pearson should write a statement against Porter and Plaintiff.

106.    Plaintiff did not write a statement against Pearson, and Plaintiff believes Leaming giving false information to Pearson and encouraging Pearson to write a statement against Porter and Plaintiff were acts of retaliation.

107.    On or about February 12, 2020, Plaintiff met with Dove.

108.    Dove told Plaintiff that the investigation into her grievance was closed and that no discrimination had been found.

109.    Dove told Plaintiff she had obtained statements from staff allegedly saying that Plaintiff was lazy, rude, and causing drama at work.

110.    Plaintiff reported to Dove that Pearson had shared with Plaintiff that after Plaintiff reported discrimination, Leaming had asked this co-worker to write a statement against Plaintiff.

15

111.   Dove asked Plaintiff if she had witnesses to this allegation.

112.   Plaintiff told her she did, and Plaintiff gave Dove the following names: Sherita Pearson, Monica Porter, Randa Echeverria, and London Caldwell.

113.   Dove said she would look into it, but Plaintiff does not believe she spoke to any of these individuals or took any action.

114.   On or about February 20, 2020, Nease called Plaintiff into a meeting. Richie was also present.

115.   During the meeting, Nease said it had been reported to him that Plaintiff had been discussing her reports of race discrimination.

116.   Nease informed Plaintiff that she was not supposed to be discussing her reports of race discrimination and her doing so was a class one, terminable offense.

117.   Plaintiff told Nease that she did not recall initiating any discussion with anyone about the matter and explained that another employee (Pearson) had approached her, but Plaintiff had not initiated the conversation.

118.   Nease told Plaintiff that Dove had shared with him that Plaintiff had reported to her that after Plaintiff complained of race discrimination Leaming had asked Pearson to write a statement against Plaintiff. Nease did not seem concerned by what Plaintiff had reported concerning Leaming's retaliatory actions towards her.

119.   On or about March 10, 2020, Plaintiff received a second "Employee Corrective Action Form" for being tardy.

120.     On or about May 7, 2020, Plaintiff filed a Charge of Discrimination with the EEOC and reported the race discrimination, racial harassment, and retaliation she had been experiencing during her employment with Defendants.

121.     That same day, on or about May 7, 2020, Plaintiff received another Employee Corrective Action form for tardiness.

122.     On or about May 11, 2020, Plaintiff went into work. During her shift, Plaintiff started to have an upset stomach and not feel well. Plaintiff thought perhaps it was something she had eaten the day before. Plaintiff received permission to leave work, and she went to see a doctor. The doctor confirmed that Plaintiff was not experiencing COVID-19 related symptoms and released her to return to work the next day. Later that afternoon, Leaming called Plaintiff and told her that the Regional Nurse said she could not return to work and that Plaintiff needed to quarantine for 14 days (without pay).  Plaintiff told Leaming that she had seen a doctor, and the doctor had released her to return to work. Despite this information, Leaming still required Plaintiff to miss work and quarantine for 14 days. In comparison, it is Plaintiff's understanding that a Caucasian employee named Khiley Shirey had an upset stomach and was vomiting, and Leaming allowed her to work the next day.

123.     On or about June 3, 2020, Dove questioned Plaintiff, without her attorney being present, regarding the Charge of Discrimination and Affidavit she filed, including asking Plaintiff whether or not she had recordings of specific conversations that she had discussed in her Affidavit.

124.     On or about June 19, 2020, Plaintiff worked with Kat Simpson (Simpson) & Shawna Giddens, both Caucasian women who worked PRN. It is Plaintiff's understanding that Leaming called Simpson into her office and asked her about working with Plaintiff. This is another

17

example of Leaming singling Plaintiff out to scrutinize her work performance after Plaintiff reported race/color discrimination/harassment.

125.    On or about June 23, 2020, it is Plaintiff's understanding that Jacob Ntembe (Ntembe), an African employee, was called into Leaming's office and questioned about how the "girls", i.e. Plaintiff, Porter, and Pearson (all black and/or African American women), were doing work wise.

126.    Ntembe told Plaintiff and Porter that he was also asked if he thought two new Caucasian women that had been hired would be a good fit in the memory care unit, the unit where Plaintiff, Porter, and Pearson worked.

127.    On or about June 24, 2020, Leaming and Nease came to check all of their rooms. Plaintiff does not believe they checked rooms for any of the employees working in the assisted living unit.

128.    In comparison, Keith Jones and Kat Simpson, both Caucasian employees, were caught talking on their personal cellular telephones during work hours, and they were not disciplined.

129.    Plaintiff believes it was this same day that Leaming also told Porter and Plaintiff that they could no longer take breaks, including lunch breaks, together.

130.    Plaintiff is not aware of any other employees who were given these same restrictions.

131.    Plaintiff questioned Leaming about the reason for her decision and gave Leaming examples of other employees who were allowed to take breaks together.

132.     On or about June 25, 2020, Leaming and Nease continued to scrutinize Porter and Plaintiff's work performance by watching them work and/or checking all of their rooms.

133.     Plaintiff felt uncomfortable, as if she was being targeted and harassed, so Plaintiff contacted Dove to report that she felt like she was being discriminated against and/or harassed and subjected to retaliatory treatment.

134.     After Plaintiff's conversation with Dove, Dove asked Plaintiff to write a statement.

135.     Plaintiff was fired before she could give Dove her statement.

136.     On or about June 30, 2020, Leaming and Nease went to the memory care unit where Porter and Plaintiff were sitting with a resident.

137.     Plaintiff overheard Nease say, "Look at them sitting down."

138.     In response, Leaming said, "This is the shit I'm talking about."

139.     Leaming and Nease then proceed to walk into Hislop's office (Hislop was the Assistant Director of Nursing at the time) and then came back out to the dining room.

140.     Plaintiff calmly told Leaming and Nease that she felt like they were nitpicking their work and trying to find a reason to harass them and that she didn't feel that it was right.

141.     Nease proceeded to tell Plaintiff to watch her mouth.

142.     Plaintiff questioned whether or not they checked all the rooms for employees on other shifts or whether they just checked the day shift when black people were working.

143.     Leaming stated that they check all shifts, except the night shift, but Plaintiff does not believe Leaming's statement is true.

144.     Nease told Plaintiff to lower her tone.

145.     Plaintiff told Nease that she was not using a loud tone.

146.    Nease then walked out of the office.

147.    On or about July 1, 2020, Dove asked Plaintiff approximately seven "yes" or "no" questions.

148.    Plaintiff does not remember each specific question she asked, but Plaintiff answered all of Dove's questions truthfully.

149.    Plaintiff remembers several of the questions referenced the phrase "nigger bitches" and whether or not Plaintiff had heard Hislop use that word in the building.

150.    Plaintiff answered "no," as Plaintiff had not heard Hislop use that phrase.

151.    Rather, the only person Plaintiff had heard use that phrase was Pearson.

152.    On or about July 8, 2020, Plaintiff was fired.

153.    Plaintiff was told by Mike (last name unknown), a part owner and the brother of Executive Director Mary Margaret Tutera Cunningham (known as Peaches), and Dove that they had made the decision to terminate her for not being truthful in an investigation concerning "false accusations" brought against Leaming.

154.    The Employee Corrective Action form Plaintiff received stated, "On 7/1/20, when asked by the company's Regional HR Director during an EEOC investigation, Stephanie denied that Allison Hislop had informed her and other Mission Chateau employees that the Health Care Coordinator had [falsely] called them inappropriate names and racial slurs. During the investigation, it was substantiated, by two witnesses, that Allison did in fact inform Stephanie and other Mission Chateau employees that the Health Care Coordinator had [falsely] called them inappropriate names and racial slurs."

155.    No one would tell Plaintiff the names of the two alleged witnesses.

20

156.   It is Plaintiff's understanding that Porter and Hislop were also terminated.

157.   It is also Plaintiff's understanding that prior to Hislop's termination, Hislop had reported that Leaming had made racist comments in the workplace and/or engaged in retaliatory behavior.

158.   Since Leaming became the Director of Nursing, the following black and/or African American employees have been fired or quit: Monica Porter, Ronald Baker, Randa Echeverria, Makenze Nimmo, Latisha McCuiston, Nancy Gaeten, Karen Jorden, Connie Cain, Sherrie Moore, Josette Palacios, Damond Russell, Chardonney Atkins, Joshua Galiwango, Angela Bell, and Ann Sagoe.

## COUNT I – RETALIATION IN VIOLATION OF TITLE VII AND 42 U.S.C. §1981

159.   Plaintiff hereby incorporates by reference into Count I all allegations contained in all preceding paragraphs herein.

160.   As set forth above, Plaintiff engaged in protected activity, including without limitation, reporting to Defendants her good faith belief and/or reasonable belief that she and others were being discriminated against based on her/their race/color.

161.   As a result of and/or in retaliation for engaging in one or more protected activities described herein, Defendants retaliated against Plaintiff, including, but not limited to, failing to promote Plaintiff to a Mentor/Lead CNA position, issuing Plaintiff Employee Corrective Actions, changing her work schedule to force Plaintiff to work weekends, encouraging one or more employees to write false statements against her, scrutinizing her work performance, placing limitations on her breaks, and terminating her employment in violation of Title VII of the Civil Rights Act of 1964, as amended in 1991, 42 U.S.C. § 2000 et seq., and 42 U.S.C. § 1981.

162.    All actions or inactions of or by Defendants occurred by and through their agents, servants, or employees acting within the course and scope of their employment, as set forth herein.

163.     As a direct and proximate result of the unlawful conduct of Defendants as set forth herein, Plaintiff has suffered damages including emotional distress, pain and suffering, past and future lost wages and benefits, a detrimental job record, career damage and diminished career potential, mental distress in the form of embarrassment, degradation, humiliation, anxiety, loss of enjoyment of life, loss of sleep, and other nonpecuniary losses. Plaintiff is also entitled to other appropriate equitable relief.

164.    The conduct of Defendants was intentional, malicious, and/or outrageous and evidenced an evil motive or conscious disregard for the rights of Plaintiff and others similarly situated, entitling Plaintiff to an award of punitive damages.

165.    Plaintiff is entitled to recover all her costs, expenses, expert witness fees, and attorneys' fees incurred in this matter as well as other appropriate equitable relief.

**WHEREFORE,** Plaintiff prays for judgment against Defendants for actual, compensatory, and punitive damages, all costs, expenses, expert witness fees and attorneys' fees incurred herein, appropriate equitable relief, for interest at the highest lawful rate, and for such other and further relief as the Court deems just and proper.

## COUNT II - RACE DISCRIMINATION IN VIOLATION OF TITLE VII AND 42 U.S.C. §1981

166.    Plaintiff hereby incorporates by reference into Count II all allegations contained in all preceding paragraphs herein.

167.    During Plaintiff's employment with Defendants and as set forth above, Defendants subjected Plaintiff to discrimination and disparate treatment based on her race and/or color with

22

respect to her compensation, terms, conditions, and/or privileges of employment in violation of Title VII of the Civil Rights Act of 1964, as amended in 1991, 42 U.S.C. § 2000 et seq., and 42 U.S.C. § 1981.

168.    Plaintiff has a contract for employment as construed pursuant to 42 U.S.C. § 1981 which Defendants violated because of Plaintiff's color and/or race, African American.

169.    During Plaintiff's employment with Defendants, Defendants denied Plaintiff the same right to make and enforce contracts and to the full and equal benefits of all laws and proceedings for the security of persons and property as is enjoyed by white citizens in violation of 42 U.S.C. § 1981.

170.    All actions or inactions of or by Defendants occurred by and through their agents, servants, or employees acting within the course and scope of their employment, as set forth herein.

171.    As a direct and proximate result of the unlawful conduct of Defendants as set forth herein, Plaintiff has suffered damages including emotional distress, pain and suffering, past and future lost wages and benefits, a detrimental job record, career damage and diminished career potential, mental distress in the form of embarrassment, degradation, humiliation, anxiety, loss of enjoyment of life, loss of sleep, and other nonpecuniary losses. Plaintiff is also entitled to other appropriate equitable relief.

172.    The conduct of Defendants was intentional, malicious, and/or outrageous and evidenced an evil motive or conscious disregard for the rights of Plaintiff and others similarly situated, entitling Plaintiff to an award of punitive damages.

173.    Plaintiff is entitled to recover all her costs, expenses, expert witness fees, and attorneys' fees incurred in this matter as well as other appropriate equitable relief.

**WHEREFORE,** Plaintiff prays for judgment against Defendants for actual, compensatory, and punitive damages, all costs, expenses, expert witness fees and attorneys' fees incurred herein, appropriate equitable relief, for interest at the highest lawful rate, and for such other and further relief as the Court deems just and proper.

## COUNT III – RACIALLY HOSTILE AND OFFENSIVE WORK ENVIRONMENT IN VIOLATION OF TITLE VII

174.    Plaintiff hereby incorporates by reference into Count III all allegations contained in all preceding paragraphs herein.

175.    As set forth above, Plaintiff was subjected to a hostile and offensive work environment because of her race and/or color which she found and which a reasonable person would find to be offensive and which altered the terms and conditions of her employment in violation of Title VII of the Civil Rights Act of 1964, as amended in 1991, 42 U.S.C. § 2000 et seq.

176.    The conduct at issue was engaged in by Plaintiff's supervisors, for which Defendants should be held vicariously liable.  Alternatively, to the extent that the conduct at issue was engaged in by non-supervisory employees of Defendants, Defendants knew or should have known about the hostile and abusive work environment, but Defendants failed to take prompt or appropriate remedial or corrective action in response to the hostile and abusive work environment.

177.    All actions or inactions of or by Defendants occurred by or through their agents, servants, or employees acting within the course and scope of their employment, as set forth herein.

178.    As a direct and proximate result of the unlawful conduct of Defendants as set forth herein, Plaintiff has suffered damages including emotional distress, pain and suffering, past and future lost wages and benefits, a detrimental job record, career damage and diminished career

24

potential, mental distress in the form of embarrassment, degradation, humiliation, anxiety, loss of enjoyment of life, loss of sleep, and other nonpecuniary losses. Plaintiff is also entitled to other appropriate equitable relief.

179.    The conduct of Defendants was intentional, malicious, and/or outrageous and evidenced an evil motive or conscious disregard for the rights of Plaintiff and others similarly situated, entitling Plaintiff to an award of punitive damages.

180.    Plaintiff is entitled to recover all her costs, expenses, expert witness fees, and attorneys' fees incurred in this matter as well as other appropriate equitable relief.

**WHEREFORE,** Plaintiff prays for judgment against Defendants for actual, compensatory, and punitive damages, all costs, expenses, expert witness fees and attorneys' fees incurred herein, appropriate equitable relief, for interest at the highest lawful rate, and for such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a jury trial on all Counts and all allegations contained herein.

## REQUEST FOR PLACE OF TRIAL

Plaintiff hereby requests that the trial of this matter take place in Kansas City, Kansas.

Respectfully submitted,

**EMPLOYEE & LABOR LAW GROUP**
**OF KANSAS CITY, LLC**

By:  /s/Kristi L. Kingston
        Kristi L. Kingston, KS Bar No. 19126
        12920 Metcalf Avenue, Suite 180
        P.O. Box 25843
        Overland Park, KS  66225
        Ph:    (913) 286-5200
        Fax:   (913) 286-5201
        Email: kristi@elgkc.com

**ATTORNEY FOR PLAINTIFF**